Justice ALITO, concurring.
As the Court takes pains to note, this is a highly unusual case. Indeed, it is likely one of a kind. In 1996, four defenseless victims, three white and one black, were slaughtered in a furniture store in a small town in Montgomery County, Mississippi, a jurisdiction with fewer than 11,000 inhabitants. One of the victims was the owner of the store, which was widely frequented by residents of the community. The person prosecuted for this crime, petitioner Curtis Flowers, an African-American, comes from a local family whose members make up a gospel group and have many community ties.
By the time jury selection began in the case now before us, petitioner had already been tried five times for committing that heinous and inflammatory crime. Three times, petitioner was convicted and sentenced to death, but all three convictions were reversed by the State Supreme Court. Twice, the jurors could not reach a unanimous verdict. In all of the five prior trials, the State was represented by the same prosecutor, and as the Court recounts, many of those trials were marred by racial discrimination in the selection of jurors and prosecutorial misconduct. Nevertheless, the prosecution at the sixth trial was led by the same prosecutor, and the case was tried in Montgomery County where, it appears, a high percentage of the potential jurors have significant connections to either petitioner, one or more of the victims, or both.
These connections and the community's familiarity with the case were bound to complicate a trial judge's task in trying to determine whether the prosecutor's asserted reason for striking a potential juror was a pretext for racial discrimination, and that is just what occurred. Petitioner argues that the prosecution improperly struck five black jurors, but for each of the five, the prosecutor gave one or more reasons that were not only facially legitimate but were of a nature that would be of concern to a great many attorneys. If another prosecutor in another case in a larger jurisdiction gave any of these reasons for exercising a *2252 peremptory challenge and the trial judge credited that explanation, an appellate court would probably have little difficulty affirming that finding. And that result, in all likelihood, would not change based on factors that are exceedingly difficult to assess, such as the number of voir dire questions the prosecutor asked different members of the venire.
But this is not an ordinary case, and the jury selection process cannot be analyzed as if it were. In light of all that had gone before, it was risky for the case to be tried once again by the same prosecutor in Montgomery County. Were it not for the unique combinations of circumstances present here, I would have no trouble affirming the decision of the Supreme Court of Mississippi, which conscientiously applied the legal standards applicable in less unusual cases. But viewing the totality of the circumstances present here, I agree with the Court that petitioner's capital conviction cannot stand.
Justice THOMAS, with whom Justice GORSUCH joins as to Parts I, II, and III, dissenting.
On a summer morning in July 1996 in Winona, Mississippi, 16-year-old Derrick "Bobo" Stewart arrived for the second day of his first job. He and Robert Golden had been hired by the Tardy Furniture store to replace petitioner Curtis Flowers, who had been fired a few days prior and had his paycheck docked for damaging store property and failing to show up for work. Another employee, Sam Jones, Jr., planned to teach Stewart and Golden how to properly load furniture.
On Jones' arrival, he found a bloodbath. Store owner Bertha Tardy and bookkeeper Carmen Rigby had each been murdered with a single gunshot to the head. Golden had been murdered with two gunshots to the head, one at very close range. And Stewart had been shot, execution style, in the back of his head. When Jones entered the store, Stewart was fighting for every breath, blood pouring over his face. He died a week later.
On the morning of the murders, a .380-caliber pistol was reported stolen from the car of Flowers' uncle, and a witness saw Flowers by that car before the shootings. Officers recovered .380-caliber bullets at Tardy Furniture and matched them to bullets fired by the stolen pistol. Gunshot residue was found on Flowers' hand a few hours after the murders. A bloody footprint found at the scene matched both the size of Flowers' shoes and the shoe style that he was seen wearing on the morning of the murders. Multiple witnesses placed Flowers near Tardy Furniture that morning, and Flowers provided inconsistent accounts of his whereabouts. Several hundred dollars were missing from the store's cash drawer, and $ 235 was found hidden in Flowers' headboard after the murders. 240 So.3d 1082, 1092-1095, 1107 (Miss. 2017).
In the 2010 trial at issue here, Flowers was convicted of four counts of murder and sentenced to death. Applying heightened scrutiny, the state courts found that the evidence was more than sufficient to convict Flowers, that he was tried by an impartial jury, and that the State did not engage in purposeful race discrimination in jury selection in violation of the Equal Protection Clause. Id., at 1096, 1113, 1139, 1135.
The Court today does not dispute that the evidence was sufficient to convict Flowers or that he was tried by an impartial jury. Instead, the Court vacates Flowers' convictions on the ground that the state courts clearly erred in finding that the State did not discriminate based on race when it struck Carolyn Wright from the jury.
*2253 The only clear errors in this case are committed by today's majority. Confirming that we never should have taken this case, the Court almost entirely ignores-and certainly does not refute-the race-neutral reasons given by the State for striking Wright and four other black prospective jurors. Two of these prospective jurors knew Flowers' family and had been sued by Tardy Furniture-the family business of one of the victims and also of one of the trial witnesses. One refused to consider the death penalty and apparently lied about working side-by-side with Flowers' sister. One was related to Flowers and lied about her opinion of the death penalty to try to get out of jury duty. And one said that because she worked with two of Flowers' family members, she might favor him and would not consider only the evidence presented. The state courts' findings that these strikes were not based on race are the opposite of clearly erroneous; they are clearly correct. The Court attempts to overcome the evident race neutrality of jury selection in this trial by pointing to a supposed history of race discrimination in previous trials. But 49 of the State's 50 peremptory strikes in Flowers' previous trials were race neutral. The remaining strike occurred 20 years ago in a trial involving only one of Flowers' crimes and was never subject to appellate review; the majority offers no plausible connection between that strike and Wright's.
Today's decision distorts the record of this case, eviscerates our standard of review, and vacates four murder convictions because the State struck a juror who would have been stricken by any competent attorney. I dissent.
I
Twice now, the Court has made the mistake of granting this case. The first time, this case was one of three that the Court granted, vacated, and remanded in light of Foster v. Chatman , 578 U. S. ----, 136 S.Ct. 1737, 195 L.Ed.2d 1 (2016), which involved a challenge under Batson v. Kentucky , 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). See Flowers v. Mississippi , 579 U. S. ----, 136 S.Ct. 2157, 195 L.Ed.2d 817 (2016). But " Foster did not change or clarify the Batson rule in any way," so remanding was senseless and unproductive: "Without pointing out any errors in the State Supreme Court's analysis" or bothering to explain how Foster was relevant, "the [Court] simply order[ed] the State Supreme Court to redo its work." Flowers , 579 U. S., at ----, ----, 136 S.Ct., at 2158, 2159 (ALITO, J., dissenting).
Unsurprisingly, no one seemed to understand Foster 's relevance on remand. The defendants simply "re-urge[d] the arguments [they] had raised" before, and all three courts promptly reinstated their prior decisions-confirming the impropriety of the entire enterprise. 240 So.3d at 1117-1118, 1153 ; State v. Williams , 2013-0283 (La.App.4Cir. 9/7/16), 199 So.3d 1222, 1230, 1238 (pointing out that "Foster did not change the applicable principles for analyzing a Batson claim"); Ex parte Floyd , 227 So.3d 1, 13 (Ala. 2016).
Flowers then filed another petition for certiorari, raising the same question as his first petition: whether a prosecutor's history of Batson violations is irrelevant when assessing the credibility of his proffered explanations for peremptory strikes. Under our ordinary certiorari criteria, we would never review this issue. There is no disagreement among the lower courts on this question, and the question is not implicated by this case-the Mississippi Supreme Court did consider the prosecutor's history, see 240 So.3d at 1122-1124, 1135, and, to the extent there is a relevant history *2254 here, it is one of race-neutral strikes, see Part III, infra .
Nonetheless, Flowers' question presented at least had the virtue of being a question of law that could affect Batson 's application. Unchastened by its Foster remand, however, the Court granted certiorari and changed the question presented to ask merely whether the Mississippi Supreme Court had misapplied Batson in this particular case. In other words, the Court tossed aside any pretense of resolving a legal question so it could reconsider the factual findings of the state courts. In so doing, the Court disregards the rule that "[w]e do not grant a certiorari to review evidence and discuss specific facts," United States v. Johnston , 268 U.S. 220, 227, 45 S.Ct. 496, 69 L.Ed. 925 (1925), particularly where there are " 'concurrent findings of fact by two courts below,' " Exxon Co., U. S. A. v. Sofec, Inc. , 517 U.S. 830, 841, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996).
The Court does not say why it disregarded our traditional criteria to take this case. It is not as if the Court lacked better options. See Gee v. Planned Parenthood of Gulf Coast, Inc. , 586 U. S. ----, 139 S.Ct. 408, 202 L.Ed.2d 503 (2018) (THOMAS, J., dissenting from denial of certiorari). Perhaps the Court lacked confidence in the proceedings below. Flowers' case, like the others needlessly remanded in light of Foster , comes to us from a state court in the South. These courts are "familiar objects of the Court's scorn," United States v. Windsor , 570 U.S. 744, 795, 133 S.Ct. 2675, 186 L.Ed.2d 808 (2013) (Scalia, J., dissenting), especially in cases involving race.[1]
Or perhaps the Court granted certiorari because the case has received a fair amount of media attention. But if so, the Court's action only encourages the litigation and relitigation of criminal trials in the media, to the potential detriment of all parties-including defendants. The media often seeks "to titillate rather than to educate and inform." Chandler v. Florida , 449 U.S. 560, 580, 101 S.Ct. 802, 66 L.Ed.2d 740 (1981). And the Court has "long recognized that adverse publicity can endanger the ability of a defendant to receive a fair trial," by "influenc[ing] public opinion" and "inform[ing] potential jurors of ... information wholly inadmissible at the actual trial." Gannett Co. v. DePasquale , 443 U.S. 368, 378, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979) ; e.g., Sheppard v. Maxwell , 384 U.S. 333, 356-363, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) ; Irvin v. Dowd , 366 U.S. 717, 725-728, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Media attention can produce other dangers, too, including discouraging reluctant witnesses from testifying and encouraging eager witnesses, prosecutors, defense counsel, and even judges to perform for the audience. See Estes v. Texas , 381 U.S. 532, 591, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (Harlan, J., concurring). Any appearance that this Court gives closer scrutiny to cases with significant media attention will only exacerbate these problems and undermine the fairness of criminal trials.
Whatever the Court's reason for taking this case, we should have dismissed it as improvidently granted. If the Court wanted to simply review the state courts' application of Batson , it at least could have had the decency to do so the first time around. Instead, the Court wasted the State's, defendant's, *2255 and lower court's time and resources-to say nothing of prolonging the ongoing " 'nightmare' " of Bobo Stewart's and the other victims' families as they await justice. Tr. 3268-3272. And now, the majority considers it a point of pride to "break no new legal ground," ante, at 2235, 2251, and proceeds to second-guess the factual findings of two different courts on matters wholly collateral to the merits of the conviction. If nothing else, its effort proves the reason behind the rule that we do not take intensively fact-specific cases.
II
The majority's opinion is so manifestly incorrect that I must proceed to the merits. Flowers presented no evidence whatsoever of purposeful race discrimination by the State in selecting the jury during the trial below. Each of the five challenged strikes was amply justified on race-neutral grounds timely offered by the State at the Batson hearing. None of the struck black jurors was remotely comparable to the seated white jurors. And nothing else about the State's conduct at jury selection-whether trivial mistakes of fact or supposed disparate questioning-provides any evidence of purposeful discrimination based on race.
A
1
The majority focuses its discussion on potential juror Carolyn Wright, but the State offered multiple race-neutral reasons for striking her. To begin, Wright lost a lawsuit to Tardy Furniture soon after the murders, and a garnishment order was issued against her. App. 71-72; Record 2697. Noting that Wright claimed the lawsuit "would not affect her evaluation of the case," the majority questions how this lawsuit "could affect [Wright's] ability to serve impartially." Ante, at 2250. But the potential bias is obvious. The "victims in this case" did not merely "wor[k] at Tardy Furniture." Ibid . At the time of the murders, Bertha Tardy owned Tardy Furniture. Following her murder, her daughter and son-in-law succeeded her as owners; they sued Wright, and the daughter testified at this trial. See App. 71, 209; 240 So.3d at 1093 ; Tr. 1656. Neither the trial court nor Flowers suffered from any confusion as to how losing a lawsuit to a trial witness and daughter of a victim might affect a juror. See App. 280, and n. 2; Recording of Oral Arg. 13:40-13:47 in No. 2010-DP-01328-SCT (Miss., July 14, 2014) (Flowers' counsel arguing that " 'the potential jurors who were sued by' " Tardy had more " 'basis for being upset with her' " than Flowers did), https://judicial.mc.edu/case.php?id=1122570. Indeed, a portion of the daughter's testimony focused on obtaining judgments and garnishments against customers who did not pay off their accounts. Tr. 2672-2674.
Faced with this strong race-neutral reason for striking Wright, the majority first suggests that the State did not adequately explain how the lawsuit could affect Wright. But it is obvious, and in any event the majority is wrong-the State did spell it out. See App. 209 (" 'She was sued by Tardy Furniture, after these murders, by the family members that will be testifying here today' "). Moreover, Flowers did not ask for further explanation, instead claiming that " 'there is no evidence of an actual lawsuit,' " id., at 211, even though Wright had admitted it, id., at 71-72. The State then entered into the record a copy of the judgment containing a garnishment amount. Id., at 215; see Record 2697.
Second, the majority quotes the dissent below for the proposition that the " 'State's unsupported characterization of the lawsuit is problematic.' " Ante, at 2250. But the Court neglects to mention that *2256 the dissent's basis for this statement was that "[n]othing in the record supports the contention that Wright's wages were garnished." 240 So.3d at 1162 (King, J., dissenting). Again, that is incorrect. See Record 2697.
Finally, the majority dismisses the lawsuit's significance because "the State did not purport to rely on that reason alone as the basis for the Wright strike." Ante, at 2250 (emphasis added). But the fact that the State had additional race-neutral reasons to strike Wright does not make the lawsuit any less of a race-neutral reason. As the State explained, Wright knew nearly every defense witness and had worked with Flowers' father at what the trial court described as the " 'smallest Wal-Mart ... that I know in existence.' " App. 218. The majority tries to minimize this connection by pointing out that "Wright said she did not know whether Flowers' father still worked at Wal-Mart." Ante, at 2249. That is understandable, given that Wright testified that she no longer worked at the Wal-Mart. Tr. 782. The majority misses the point: Wright had worked in relatively close proximity with the defendant's father.[2]
2
The majority, while admonishing trial courts to "consider the prosecutor's race-neutral explanations," ante, at 2243, completely ignores the State's race-neutral explanations for striking the other four black jurors.
Tashia Cunningham stated repeatedly that she " 'd[id]n't believe in the death penalty' " and would " 'not even consider' " it. App. 129; see 2d Supp. Record 256b. When pressed by the trial court on this point, she vacillated, saying that she " 'd[id]n't think' " she could consider the death penalty but then, " 'I might. I might. I don't know. I might.' " App. 130. Opposition to the death penalty is plainly a valid, race-neutral reason for a strike. Moreover, Cunningham knew Flowers' sister, having worked with her on an assembly line for several years. Id., at 83-85. She testified that they did not work in close proximity, but a supervisor testified that they actually worked " 'side by side.' " Id., at 149-152. Both this apparent misstatement and the fact that Cunningham worked with Flowers' sister are valid, race-neutral reasons.
Next, Edith Burnside knew Flowers personally. Flowers had visited in her home, lived one street over, and played basketball with her sons. Id., at 75, 79-80. Burnside also testified repeatedly that she " 'could not judge anyone,' " no " 'matter what the case was,' " id., at 69-70, 143-144, and that her " 'problem with judging' " could " 'affect [her] judgment' " here, id., at 144. Finally, she too was sued by Tardy Furniture soon after the murders, and a garnishment order was entered against her. See id., at 71, 141-142; Tardy Furniture Co. v. Burnside , Civ. No. 1359 (Justice Ct. Montgomery Cty., Miss., June 23, 1997), Dkt. 13, p. 553.
Next, Dianne Copper had worked with both Flowers' father and his sister for " 'a year or two' " each. App. 77, 189, 234, 236. She agreed that because of these relationships and others with various defense witnesses, she might " 'lean toward' " Flowers and would be unable to " 'come in here ... with an open mind.' " Id., at 190; see id., at 78. She also said that deciding the case on " 'the evidence only' " would make her " 'uncomfortable.' " Id., at 191-192.
*2257 Finally, as to Flancie Jones, Flowers conceded below that he "did not challenge [her] strike" and that " 'the State's bases for striking Jones appear to be race neutral.' " Supp. Brief for Appellant in No. 2010-DP-01348-SCT (Miss.), p. 20, n. 12. Because any argument as to Jones "was not raised below, it is waived." Sprietsma v. Mercury Marine , 537 U.S. 51, 56, n. 4, 123 S.Ct. 518, 154 L.Ed.2d 466 (2002). Even if Flowers had not waived this argument, this strike was obviously supported by race-neutral reasons. Jones was related to Flowers in several ways. See App. 73, 179. She was late to court on multiple occasions. Id., at 180, 182. On her juror questionnaire, she said she was " 'strongly against the death penalty,' " but when asked about her opposition, said, " 'I guess I'd say anything to get off' " jury duty. Id., at 181; see 2d Supp. Record 325b. She then admitted that she was not necessarily "being truthful" on her questionnaire but refused to provide her actual view on the death penalty, saying, " 'I-really and truly ... don't want to be here.' " App. 181-182.
3
In terms of race-neutral validity, these five strikes are not remotely close calls. Each strike was supported by multiple race-neutral reasons articulated by the State at the Batson hearing and supported by the record. It makes a mockery of Batson for this Court to tell prosecutors to "provide race-neutral reasons for the strikes," and to tell trial judges to "consider the prosecutor's race-neutral explanations in light of all of the relevant facts and circumstances," ante, at 2243, and then completely ignore the State's reasons for four out of five strikes.
Only by ignoring these facts can the Court assert that "the State's decision to strike five of the six black prospective jurors is further evidence suggesting that the State was motivated in substantial part by discriminatory intent." Ante, at 2246. Putting aside the fact that the majority has its numbers wrong (the State struck five of seven potential black jurors),[3] the bare numbers are meaningless outside the context of the reasons for the strikes. The majority has no response whatsoever to the State's race-neutral explanations and, for four of the five strikes, does not dispute the state courts' conclusion that race played no role at all. For Batson purposes, these strikes might as well have been exercised against white jurors. Yet the majority illegitimately counts them all against the State.
B
Given the multiple race-neutral reasons for the State's strikes, evidence of racial discrimination would have to be overwhelming to show a Batson violation. The majority's evidence falls woefully short.
As the majority explains, "comparing prospective jurors who were struck and not struck can be an important step in determining whether a Batson violation occurred." Ante, at 2248 - 2249. For example, "[w]hen a prosecutor's 'proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack panelist who is permitted to serve, that is evidence tending to prove purposeful discrimination.' " Ante , at 2249. By the same token, a defendant's failure to find any similarly-situated whites permitted to serve tends to disprove purposeful discrimination.
*2258 Here, neither the majority nor Flowers has identified any nonstruck white jurors remotely similar to any of the struck black jurors.
The majority points to white jurors Pamela Chesteen and Bobby Lester, who worked at the Bank of Winona and therefore had interacted with several members of Flowers' family as bank customers. By the majority's lights, Chesteen's and Lester's banker-customer relationship was the same as Wright's co-worker relationship with Flowers' father. Ante, at 2248 - 2249. That comparison is untenable. Lester testified that working at the bank meant he and Chesteen " 's[aw] everyone in town.' " App. 86. And as the trial court explained, "a bank teller, who waits on customers at a bank," has a "substantially different" relationship from someone who "work[s] at the same business establishment with members of the defendant's family." Id., at 278; see id., at 236. The Mississippi Supreme Court agreed that "a coworker relationship" and "employee/ customer relationship are distinguishable." 240 So.3d at 1127. The majority mentions none of this, evidently relying on its superior knowledge of the banker-customer relationships at the Bank of Winona.
The more relevant comparator to Chesteen and Lester is Alexander Robinson, a black man who was a customer at a store where Flowers' brother worked. App. 82. The State confirmed with Robinson that this relationship was " 'just a working relationship' "-i.e., an employee-customer relationship-and immediately thereafter clarified with Chesteen and Lester that their relationships with Flowers' family members was " 'like Mr. Robinson, just a working relationship.' " Id., at 82-83, 85-86.[4] The State then tendered Robinson, Chesteen, and Lester as jurors. Id., at 203, 208. Later, the State would strike black jurors Wright and Copper, who were both co-workers of members of Flowers' family. As the trial court understood, it is "evident ... that the prosecution utilized peremptory strikes only against those individuals who actually worked with, or who in the past had worked with, members of Flowers' family." Id., at 278; see id., at 279.
Next, the majority contends that white jurors Chesteen, Lester, and Harold Waller, like Wright, "knew many individuals involved in the case." Ante, at 2249. Yet the majority concedes that Wright knew more individuals than any of them. And the more relevant statistic from the State's perspective is how many defense witnesses a juror knows, since that knowledge suggests a greater connection to the defendant. By Flowers' own count, Wright knew substantially more defense witnesses than the three white jurors. According to Flowers, Wright knew 19 defense witnesses, while Chesteen knew 14 and Lester and Waller knew around 6 each. See Brief for Petitioner 49, n. 37; Brief for Appellant in No. 2010-DP-01348-SCT (Miss.), p. 114.
Additional relevant differences existed between Wright and the three white jurors. Wright had been sued by a witness and member of the victim's family, and worked at the same store as the defendant's father. Chesteen, on the other hand, was friends with the same member of the victim's family and also knew another victim's wife. App. 93-94, 46. The trial court found that Chesteen "had a much closer relationship with members of the victim[s'] families tha[n] she had with anyone in Flowers' family." Id., at 278.
Likewise, Waller knew victim Carmen Rigby and her husband; their children attended school with his daughter, and *2259 " '[t]hey were involved in school activities together.' " Tr. 821, 1042. He served on the school board with Rigby. Id., at 1043. And victim Bobo Stewart " 'went to school with [Waller's] daughter,' " and Waller knew his family. App. 48, 53.
Similarly, Lester had been friends with Rigby's husband " 'for years,' " and he " 'knew her family.' " Tr. 822, 1045. Lester's wife taught Stewart first grade. App. 48; Tr. 1045. Lester was related by marriage to Bertha Tardy and had known the Tardy family his entire life, growing up with Bertha's daughter. Id., at 787-788. His daughter had just graduated with Bertha's grandson, and they were friends. Id., at 788, 1046. As Lester put it, " 'I have a lot of connections to the [victims'] families.' " Id., at 788.
Given that these prospective jurors were favorable for the State, it is hardly surprising that the State would not affirmatively "us[e] individual questioning to ask th[e]se potential white jurors whether they could remain impartial despite their relationships" with victims' families or prosecution witnesses, ante, at 2249, for to do so could invite defense strikes. Revealingly, Flowers' counsel had exhaustively questioned these three white jurors-treating them much differently than Wright. Flowers' counsel asked Wright only a handful of questions, all of which sought to confirm that she could judge impartially. App. 90-91, 105-106. By contrast, Flowers' counsel asked Chesteen more than 30 questions, most of which sought to cast doubt on Chesteen's ability to remain impartial given her relationships with the victims' families. Id., at 93-95, 111-118. Flowers' counsel asked Lester more than 60 questions and Waller about 15 questions along the same lines. Tr. 1045-1047; App. 160-174; Tr. 1042-1044; App. 123-124. Flowers was so concerned about these white jurors' connections with the victims that he tried to strike both Chesteen and Lester-but not Wright-for cause, and when that failed, he exercised peremptory strikes on all three white jurors. Tr. 1622, 1624, 1743-1744; App. 204, 208; see id., at 278.
In short, no reasonable litigant or trial court would consider Wright "similarly situated," ante, at 2249, to these three white jurors.
C
The majority next discovers "clue[s]" of racial discrimination in minor factual mistakes supposedly made by the State during the Batson hearing. Ante, at 2250. As an initial matter, Flowers forfeited this argument by failing to present it to the trial court. Under Batson , the trial court must decide whether, "in light of the parties' submissions ," "the defendant has shown purposeful discrimination." Snyder v. Louisiana , 552 U.S. 472, 477, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008) (emphasis added; internal quotation marks omitted). The Court has made clear that "a prosecutor simply has got to state his reasons as best he can [at the Batson hearing] and stand or fall on the plausibility of the reasons he gives." Miller-El v. Dretke , 545 U.S. 231, 252, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005).
The same rule must apply to the defendant, the party with the ultimate burden of proving purposeful discrimination. Johnson v. California , 545 U.S. 162, 170-171, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005) ; Batson , 476 U.S. at 96-98, 106 S.Ct. 1712. Thus, if the defendant makes no argument on a particular point, the trial court's failure to consider that argument cannot be erroneous, much less clearly so. See, e.g. , Davis v. Baltimore Gas and Elec. Co. , 160 F.3d 1023, 1027-1028 (CA4 1998) ; Wright v. Harris County , 536 F.3d 436, 438 (CA5 2008). Excusing the defendant from making his arguments before the trial court *2260 encourages defense counsel to remain silent, prevents the State from responding, deprives the trial court of relevant arguments, and denies reviewing courts a sufficient record. See Snyder , supra, at 483, 128 S.Ct. 1203 ; Garraway v. Phillips , 591 F.3d 72, 76-77 (CA2 2010).[5]
Even if Flowers had not forfeited his argument about the State's "mistakes," it is devoid of merit. The Batson hearing was conducted immediately after voir dire , before a transcript was available. App. 214; id., at 225-226. In explaining their strikes, counsel relied on handwritten notes taken during a fast-paced, multiday voir dire involving 156 potential jurors. Id., at 229, 258. Still, the majority comes up with only a few mistakes, and they are either imagined or utterly trivial. The majority claims that the State incorrectly "asserted that Burnside"-one of the struck black jurors-"had tried to cover up a Tardy Furniture suit." Ante, at 2250. But the State's assertion was at least reasonable. When the State asked Burnside about the lawsuit, she responded that " '[i]t wasn't a dispute' " and " '[w]e never had no misunderstanding about it.' " App. 141-142. Quite reasonably, the State asked why the matter ended up in court, and Burnside conceded that she had to be sued, even as she insisted that there " 'was no falling-out about it.' " Id., at 142. As previously explained, a judgment and garnishment were issued against her.
The majority's other supposed mistakes are inconsequential. First, the State confused which potential juror worked with Flowers' sister, and then corrected its mistake. See id., at 218-219, 234. Second, the State referred to that juror, Tashia Cunningham, as " 'a close friend' " of Flowers' sister, whereas the testimony established only that they worked together closely. Id., at 220. Flowers agreed with the " 'friendship' " characterization during the Batson hearing, id., at 221, and in any event, whether Cunningham and Flowers' sister were close co-workers or close friends is irrelevant. Third, the State confused struck juror Flancie Jones' familial relationships with Flowers, saying that Flowers' sister was Jones' niece, when in fact Flowers' sister was apparently married to Jones' nephew. Id., at 229, 231. But whatever the precise relationship, even Flowers conceded that Jones had an " 'in-law relationship to the entire [Flowers] family,' " so the relevant point remained: Jones was related in multiple ways to Flowers. Id., at 230-231; Tr. 967-968. It is hard to imagine less significant "mistakes."
Tellingly, Flowers' counsel, although aided by " 'many interns,' " App. 214, made many more mistakes during this process. E.g., id., at 204-205 (incorrectly identifying a juror); id., at 207-208 (striking a juror and then immediately making an argument premised on not striking that juror); id., at 210 (confusing jurors); id., at 211 (confusing which family members were acquainted with a juror); id., at 212 (incorrectly stating that no general question was asked of all jurors as to accounts or suits with the Tardys, see id., at 70, 217); id., at 222-223 (confusing jurors); id., at 230 (" '[M]aybe we didn't get to this juror' ").[6]
*2261 In short, in the context of the trial below, a few trivial errors on secondary or tertiary race-neutral reasons for striking some jurors can hardly be counted as "telling" evidence of race discrimination. Ante, at 2250; see ibid. ("[M]istaken explanations should not be confused with racial discrimination").
D
Turning to even less probative evidence, the majority asserts that the State engaged in disparate-"dramatically disparate," the majority repeats, ante, at 2235, 2243, 2246, 2248, 2251 questioning based on race. By the majority's count, "[t]he State asked the five black prospective jurors who were struck a total of 145 questions" and "the 11 seated white jurors a total of 12 questions." Ante, at 2247. The majority's statistical "evidence" is irrelevant and misleading.
First, the majority finds that only one juror-Carolyn Wright-was struck on the basis of race, but it neglects to mention that the State asked her only five questions. See App. 71-72, 104-105. Of course, the majority refuses to identify the "certain level of disparity" that meets its "dramatically disparate" standard, ante, at 2248, but its failure to recognize that the only juror supposedly discriminated against was asked hardly any questions suggests the majority is "slic[ing] and dic[ing]" statistics, ante, at 2246. Asking other black jurors more questions would be an odd way of "try[ing] to find some pretextual reason" to strike Wright. Ante, at 2247.
Second, both sides asked a similar number of questions to the jurors they peremptorily struck. This is to be expected-a party will often ask more questions of jurors whose answers raise potential problems. Among other reasons, a party may wish to build a case for a cause strike, and if a cause strike cannot be made, those jurors are more likely to be peremptorily struck. Here, Flowers asked the jurors he struck-all white, Tr. of Oral Arg. 57-an average of about 40 questions, and the State asked the black jurors it struck an average of about 28 questions. The number of questions asked by the State to these jurors is not evidence of race discrimination.
Moreover, the majority forgets that correlation is not causation. The majority appears to assume that the only relevant difference between the black jurors at issue and seated white jurors is their race. But reality is not so simple. Deciding whether a statistical disparity is caused by a particular factor requires controlling for other potentially relevant variables; otherwise, the difference could be explained by other influences. See Fisher, *2262 Multiple Regression in Legal Proceedings, 80 Colum. L. Rev. 702, 709 (1980) ; cf. Box v. Planned Parenthood of Indiana & Kentucky, Inc. , 587 U. S. ----, ----, n. 4, 139 S.Ct. 1780, 1787, n. 4, --- L.Ed.2d ---- (2019) (THOMAS, J., concurring) (showing that bare statistical disparities can be used to support diametrically different theories of causation). Yet the majority's raw comparison of questions does not control for any of the important differences between struck and seated jurors. See supra, at 2257 - 2259. This defective analysis does not even begin to provide probative evidence of discrimination. See, e.g., People Who Care v. Rockford Bd. of Ed., School Dist. No. 205 , 111 F.3d 528, 537-538 (CA7 1997) (Posner, C. J.) ("[A] statistical study that fails to correct for salient explanatory variables, or even to make the most elementary comparisons, has no value as causal explanation"). Indeed, it is difficult to conceive of a statistical study that could possibly control for all of the relevant variables in this context, including tone of voice, facial expressions, and other relevant information.
Most fundamentally, the majority's statistics are divorced from the realities of this case. Winona is a very small town, and " 'this was the biggest crime that had ever occurred' " there. Tr. 1870. As one juror explained, " '[e]verybody in Winona has probably' " heard about the case. Id., at 1180; accord, id., at 1183 (Flowers' counsel stating the same). One potential juror knew almost everyone " 'involved in it' " between her job as a teacher and attendance at church. App. 81-82. Tardy Furniture " 'basically did business with the whole Winona community.' " Tr. 2667.
Moreover, Flowers' family was " 'very, very prominent' " in Winona's black community. Id., at 1750. As the trial court explained,
" 'Flowers has a number of brothers and sisters. His parents are well-known. [His father] is apparently one of the most well-thought of people in this community. You have had countless numbers of African-American individuals that have come in and said they could not sit in judgment because of their knowledge of Mr. Flowers, and they could not be fair and impartial.' " App. 197; see id., at 199-200; Tr. 1750.
Flowers' counsel stated that when Flowers' father " 'was working as a greeter at Wal-Mart,' " there was " 'probably not a person in Winona who wouldn't have said, "Mr. Archie's my friend." ' " App. 221. According to the trial court, "the overwhelming majority" of potential black jurors "stated that they could not sit in judgment of him because of kinships, friendships, and family ties." Id., at 256.
To obtain a sufficient jury pool, the trial court had to call 600 potential jurors. Id., at 258. In such a small county, that meant a man, his wife, his mother, and his father were all called for jury duty in this case. See Tr. 939-941. According to Flowers,
"seventy-five percent of the total qualified venire, sixty-three percent of the venire members actually tendered for acceptance or rejection as jurors, and forty percent of the persons empanelled as jurors or alternates (six of 15) were personally acquainted with either the defendant or one or more of the decedents or their families and/or had actual opinions as to guilt or innocence formed prior [to] the trial." Brief for Appellant 130.
Before peremptory strikes even started, the venire had gone from 42% to 28% black. App. 194-195. As the trial court explained, " 'nothing the State has done has caused this statistical abnormality.' " Id., at 198. Instead, any " 'statistical abnormality' " " 'is strictly because of the prominence of [Flowers'] family.' " Id., at 200. Flowers' counsel admitted that she was not " 'surprise[d]' " by the reduction given the *2263 circumstances and the experiences in the previous trials. Id., at 199.[7]
The state courts appropriately viewed the parties' questioning in light of these circumstances. The Mississippi Supreme Court, for example, found that the State "asked more questions" of the "jurors who knew more about the case, who had personal relationships with Flowers's family members, who said they could not be impartial, or who said they could not impose the death penalty," and that "[t]hose issues are appropriate for followup questions." 240 So.3d at 1125. The court also found that "[t]he State's assertion that elaboration and followup questions were needed with more of the African-American jurors is supported by the record." Ibid. The majority wonders why "the State spent far more time questioning the black prospective jurors" and concludes that "[n]o one can know." Ante , at 2233, 2247. But even Flowers admits that "more African-American jurors knew the parties, most of the [State's] follow-up questions pertained to relevant matters, [and] more questions were asked of jurors who had personal relationships about the case, or qualms about the death penalty." Pet. for Cert. 23 (emphasis deleted).
The majority ignores Flowers' concession, but the questions asked by the State bear it out. The State's questions also refute the majority's suggestion that the State did not "not as[k] white prospective jurors th[e] same questions." Ante, at 2247. The State asked all potential jurors whether Tardy Furniture sued them, and only Wright and Burnside answered in the affirmative. See App. 70-71, 99-100, 217-218. Two of five questions to Wright and around eight questions to Burnside followed up on this lawsuit. Id., at 70-72, 141-143. All potential jurors were asked whether they knew Flowers' father, and no white jurors had worked with him at Wal-Mart. Id., at 61, 218. Two of Wright's remaining three questions followed up on this relationship. Id., at 104-105. The State asked all potential jurors whether anyone lived in the areas around Flowers' house, and no white jurors answered in the affirmative. Id., at 75-81. Seven questions to Copper-another black prospective juror-and three to Burnside followed up on this geographic proximity. Id., at 75-77, 79-80. Copper's remaining questions were mostly about her working with Flowers' father and sister and her statement that she would lean in Flowers' favor. Id., at 77-78, 189-190. Burnside's remaining questions were mostly about Flowers' visits to her house and her statement that she could not judge others. Id., at 80-81, 143-144. The State asked all potential jurors whether anyone was related to Flowers' family, and only Jones, a black prospective juror, answered affirmatively, leading to about 18 follow-up questions. Id., at 72-75, 86-88, 179-180. Jones' remaining questions were mostly about her being late to court and her untruthful answer regarding the death penalty on the jury questionnaire. Id., at 75, 180-182. Finally, nearly all of Cunningham's questions were about her work with Flowers' sister. Id., at 83-85, 130-133. Any reasonable prosecutor would have followed up on these issues, and the *2264 majority does not cite even a single question that it thinks suggests racial discrimination.
The majority's comparison of the State's questions to Copper with its questions to several white jurors is baseless. As an initial matter, Flowers forfeited this argument by not making it at the trial court. See supra, at 2259 - 2260; App. 235-238. And as the Court has previously explained, "a retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial" because "an exploration of the alleged similarities at the time of trial might have shown that the jurors in question were not really comparable." Snyder , 552 U.S. at 483, 128 S.Ct. 1203.
Even if Flowers had not forfeited this argument, it is meritless. As previously discussed, Copper worked with two of Flowers' family members and testified that she could " 'lean toward' " Flowers and would not decide the case " 'with an open mind.' " App. 190; see id., at 78. These answers justified heavier questioning than was needed for Chesteen, the white bank teller who occasionally served Flowers' family members. Moreover, the State did ask Chesteen and Lester, a white juror who also worked at the bank, "follow-up questions about [their] relationships with Flowers' family." Ante , at 2247; see App. 83, 86.[8] I have already addressed Lester and Waller, another white juror who had connections to the victims, and why the State did not need to ask them more questions. See supra , at 2257 - 2259. The majority also references Larry Blaylock and Marcus Fielder, two other white prospective jurors who "had relationships with defense witnesses." Ante, at 2247. As for Blaylock, the majority makes no attempt to say what those "relationships" were, presumably because the only relationship discussed at the Batson hearing was Blaylock's 30-year friendship with the prosecutor's primary investigator-whom the defense planned to call as a hostile witness. App. 215; Tr. 1041-1042. The investigator was also his uncle by marriage, id., at 1078, and the defense asked Blaylock some 46 questions. Id., at 1041-1042, 1078, 1182-1187. Likewise, Fielder's only relationship discussed at the Batson hearing was his work for a prosecution witness who had investigated the murders. See App. 215. The defense felt it necessary to ask Fielder about 30 follow-up questions. Tr. 1255-1260. In short, despite the majority's focus on Copper, ante , at 2247, no one could (or did) compare the State's need to question her with its need to question these jurors.
Next, the majority complains that the State had a witness testify that Cunningham worked closely with Flowers' sister. According to the majority, "[t]he State apparently did not conduct similar investigations of white prospective jurors." Ibid. Putting aside that the majority offers no record support for this claim, the majority does not tell us what investigation was performed, much less which white jurors could or should have been similarly investigated. As far as the record reveals, the State made one call to Cunningham's employer on the morning of the hearing to ask a single question: Where did Cunningham work in relation to Flowers' sister? App. 149, 154. I see no reason to assume that the State failed to conduct any other single-phone-call "investigations" in this high-profile trial. Nor am I aware of white *2265 jurors who worked in any proximity to Flowers' family members. If the majority is going to infer racial bias from the State's attempt to present the truth in court-particularly in a case where juror perjury had been a problem, see supra, at 2262 - 2263, n. 7-it ought to provide a sound basis for its criticism.
Finally, to support its view that "[t]he difference in the State's approaches to black and white prospective jurors was stark," the majority asserts that "[w]hite prospective jurors who admitted that they or a relative had been convicted of a crime were accepted without apparent further inquiry by the State." Ante , at 2247. The majority again cites nothing to support this assertion, and the record does not support it. Three of the struck black jurors had relatives with a criminal conviction. See Tr. 883 (Burnside); id., at 885 (Copper ); 2d Supp. Record 255b (Cunningham). The State asked no questions to either Copper or Cunningham on this point, and it asked three questions to Burnside about her son's robbery conviction and. See App. 144-145. The State treated white jurors similarly. For example, the State asked three questions to Suzanne Winstead about a nephew's drug charges, Tr. 1190-1191; four questions to Sandra Hamilton about crimes of her first cousins, id., at 977; and two questions to Larry Blaylock about a cousin who committed murder, id., at 978-979.[9]
Because any "disparate questioning or investigation of black and white prospective jurors" here "reflect[s] ordinary race-neutral considerations," ante, at ----, this factor provides no evidence of racial discrimination in jury selection below.
E
If this case required us to decide whether the state courts were correct that no Batson violation occurred here, I would find the case easy enough. As I have demonstrated, the evidence overwhelmingly supports the conclusion that the State did not engage in purposeful race discrimination. Any competent prosecutor would have struck the jurors struck below. Indeed, some of the jurors' conflicts might even have justified for-cause strikes. But this case is easier yet. The question before us is not whether we " 'would have decided the case differently,' " Easley v. Cromartie , 532 U.S. 234, 242, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001), but instead whether the state courts were clearly wrong. And the answer to that question is obviously no.
The Court has said many times before that "[t]he trial court has a pivotal role in evaluating Batson claims." Snyder , 552 U.S. at 477, 128 S.Ct. 1203. The ultimate question in Batson cases-whether the prosecutor engaged in purposeful discrimination-"involves an evaluation of the prosecutor's credibility," and " 'the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge.' " Ibid. The question also turns on "a juror's demeanor," "making the trial court's firsthand observations of even greater importance." Ibid. "[O]nly the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." Anderson v. Bessemer City , 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).
*2266 Because the trial court is best situated to resolve the sensitive questions at issue in a Batson challenge, "a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." Snyder , supra, at 477, 128 S.Ct. 1203 ; see Foster , 578 U. S., at ----, 136 S.Ct., at 1747-1748. Our review is particularly deferential where, as here, "an intermediate court reviews, and affirms, a trial court's factual findings." Easley , supra, at 242, 121 S.Ct. 1452.
Under this clear-error standard of review, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson , supra , at 574, 105 S.Ct. 1504 ; see also Cooper v. Harris , 581 U. S. ----, ----, 137 S.Ct. 1455, 1465, 197 L.Ed.2d 837 (2017). The notion that it is "impermissible" to adopt the view of the evidence that I have outlined above is incredible. Besides being supported by carefully reasoned opinions from both the trial court and the Mississippi Supreme Court-opinions that, unlike the majority's, consider all relevant facts and circumstances-that view is at a minimum consistent with the factual record. At the Batson hearing, the State offered "a coherent and facially plausible story that is not contradicted" by the record, and the trial court's "decision to credit" such a story "can virtually never be clear error." Anderson , supra, at 575, 105 S.Ct. 1504. The trial court reasonably understood the supposedly "dramatically disparate" questioning to be explained by the circumstances of this case-circumstances that the majority does not dispute. Likewise, the trial court reasonably did not view any picayune mistakes by the State to be compelling evidence of racial discrimination. (Of course, neither did the defense, which is presumably why it did not make that argument. But the clear-error and forfeiture doctrines are speed bumps en route to the Court's desired destination.) Yet the Court discovers "clear error" based on its own review of a near-decade-old record. The majority apparently thinks that it is in a better position than the trial court to judge the tone of the questions and answers, the demeanor of the attorneys and jurors, the courtroom dynamic, and the culture of Winona, Mississippi.
III
Given that there was no evidence of race discrimination in the trial here, the majority's remaining explanation for its decision is conduct that took place before this trial. The majority builds its decision around the narrative that this case has a long history of race discrimination. This narrative might make for an entertaining melodrama, but it has no basis in the record. The history, such as it is, does not come close to carrying Flowers' burden of showing that the state courts clearly erred.
A
The State exercised 50 peremptory strikes in Flowers' previous trials. As the case comes to us, 49 of those strikes were race neutral. If this history teaches us anything, it is that we should not assume the State strikes jurors based on their race.
Flowers' first trial was for the murder of Bertha Tardy only. In that trial, the State exercised peremptory strikes on five black jurors and seven white jurors. App. 35. The trial court found that Flowers had not made out even a prima facie Batson case, id., at 12, n. 3, much less showed purposeful race discrimination in any of the State's strikes. Thus, as this case comes to us, all of the State's strikes in this trial were race neutral.
What the majority calls the second trial is actually Flowers' first trial for another *2267 murder-that of Bobo Stewart. During jury selection, the State exercised peremptory strikes on five black jurors and two white jurors; the trial court disallowed one of the State's strikes under Batson . App. 35; id., at 17-19. Flowers was convicted and apparently did not appeal on Batson grounds. Eventually, the Mississippi Supreme Court reversed Flowers' convictions from the first two trials for reasons unrelated to jury selection. The court held that certain evidence relevant to all four murders was improperly admitted. Flowers v. State , 773 So.2d 309, 317, 319-324 (Miss. 2000) ; Flowers v. State , 842 So.2d 531, 538, 539-550 (Miss. 2003).
The State next tried Flowers for all four murders together. In this "third" trial-actually the first trial for the murders of Robert Golden and Carmen Rigby-the State struck 15 black jurors. App. 35. The trial court found no Batson violations. Flowers v. State , 947 So.2d 910, 916 (Miss. 2007) (plurality opinion). On appeal, Flowers did not challenge four of the strikes, id., at 918, and the Mississippi Supreme Court unanimously upheld the trial court's ruling as to nine of the other strikes, see id., at 918-935. Four justices, constituting a plurality of the court, would have held that two strikes violated Batson , 947 So.2d at 926, 928 ; one justice concurred only in the judgment because she "d[id] not agree" with the "plurality" "that this case is reversible on the Batson issue alone," id., at 939 (Cobb, P. J., concurring in result); and four justices would have held that no strikes violated Batson , 947 So.2d at 942-943 (Smith, C. J., dissenting). If the concurring justice thought any strikes were impermissible, Batson would have required her to reverse on that basis.
Thus, the Court is wrong multiple times over to say that the Mississippi Supreme Court "conclud[ed] that the State had again violated Batson by discriminating on the basis of race in exercising all 15 of its peremptory strikes against 15 black prospective jurors." Ante, at 2237. That court unanimously concluded that 13 strikes were race neutral, and a majority concluded that the remaining two strikes did not violate Batson . Therefore, neither the trial court nor the Mississippi Supreme Court found any Batson violation in this third trial-all 15 strikes were race neutral.[10]
In the next two trials, Flowers apparently did not even allege a Batson violation. In the "fourth" trial, the State struck 11 black jurors but did not exercise its three remaining strikes; five black jurors were seated. App. 28-29, 35. In the "fifth" trial, the State struck five jurors, but Flowers is unable to identify the race of these jurors, and three black jurors were seated. Brief for Petitioner 13. Thus, up to the present trial, the State had sought to exercise 50 *2268 peremptory strikes, 36 on potential black jurors. Finally, in this trial, the State struck five black jurors and one white juror; one black juror sat on the jury, and one black juror was an alternate.
According to the majority, "the State's use of peremptory strikes in Flowers' first four trials reveal[s] a blatant pattern of striking black prospective jurors." Ante , at 2245. The majority claims that "[o]ver the course of the first four trials, there were 36 black prospective jurors against whom the State could have exercised a peremptory strike," and "[t]he State tried to strike all 36." Ibid . The majority's argument is wrong on several levels.
First, the majority is wrong on the numbers. The majority repeatedly says that over "the six trials combined," "the State struck 41 of the 42 black prospective jurors it could have struck." Ante , at 2251; see ante, at 2235. Yet in the fourth trial, according to Flowers himself, the State did not exercise available peremptory strikes on at least three black jurors. See App. 28-29. Moreover, the majority does not know the races of the struck jurors in the fifth trial. Given that at least three black jurors were seated and that the State exercised only five strikes, it would appear that the State did not exercise available strikes against at least three black jurors. Finally, in the most recent trial, the State tendered two black jurors for service on the jury, one of whom served as an alternate. (The majority's strike numbers include strikes of alternates, so its juror numbers should too.) However the majority arrived at its numbers, the record tells a different story.[11]
Second, the Court says that "[t]he State's actions in the first four trials necessarily inform our assessment of the State's intent," for "[w]e cannot ignore that history." Ante, at 2246. Putting aside that no court below ignored the history, the majority completely ignores Flowers' failure to challenge the State's actions in the fifth trial-the one that immediately preceded this one. Flowers bears the burden of proving racial discrimination, and the reason information about the fifth trial is not "available," ante, at 2263, is that Flowers failed to present it. Perhaps he did not want to present it because the State struck only white jurors-who knows? Regardless, this failure must count against Flowers' claim. Surely a party making a Batson claim cannot gather data from select trials and present only favorable snippets.
Third, and most importantly, that the State previously sought to exercise 36 strikes against black jurors does not "speak loudly" in favor of discrimination here, ante, at 2245, because 35 of those 36 strikes were race neutral. By the majority's own telling, the trial court may "consider historical evidence of the State's discriminatory peremptory strikes from past trials." Ante, at 2245 (emphasis added). As I have shown, 35 of 36 strikes were not "discriminatory peremptory strikes." The bare number of black-juror strikes is relevant only if one eliminates other explanations for the strikes, cf. supra, at 2261 - 2262, but prior adjudications (and Flowers' failure to even object to some strikes) establish that legitimate reasons explained all but one of them. Is the majority today *2269 holding that the prior courts all committed clear error too? And what about the strikes that even Flowers did not object to-is the majority sua sponte holding that the State was engaged in purposeful racial discrimination as to those strikes? The majority's reliance on race-neutral strikes to show discrimination is judicial alchemy.
B
The only incident in the history of this case even hinting at discrimination was that a trial judge 20 years ago prevented the State from striking one black juror in a case involving only one of Flowers' crimes. If this single impermissible strike could provide evidence of purposeful race discrimination in a different trial 11 years later involving different murders (and victims of different races), it is surely the weakest of evidence. Even Flowers concedes that a single " Batson violation 20 years ago" would be only "weakly probative." Tr. of Oral Arg. 19-20. That is the precise situation here. And this "weakly probative" single strike certainly does not overcome the complete absence of evidence of purposeful race discrimination in this trial. We know next to nothing about this strike, for Flowers has not even provided us with a transcript of the jury selection from that trial. And the trial court's ruling on the strike was never reviewed on appeal.
Pretending for a moment that the concurring justice in the third trial had voted differently than she did, the history still could not overcome the absence of evidence of purposeful race discrimination in this trial. Flowers forthrightly acknowledged that he needed to show "discrimination in this trial in order to have a Batson violation." Id., at 23 (emphasis added). At a minimum, the state courts' finding-that the history does not carry Flowers' burden of proving purposeful race discrimination here-is not clearly erroneous. The courts below were presented with Flowers' view of the history, and even accepting that view and "[t]aking into account the 'historical evidence' of past discrimination," the Mississippi Supreme Court held that the trial court did not err "in finding that the State did not violate Batson ." 240 So.2d at 1135; see id., at 1122-1124. The majority simply disregards this assessment by the state courts.
IV
Much of the Court's opinion is a paean to Batson v. Kentucky , which requires that a duly convicted criminal go free because a juror was arguably deprived of his right to serve on the jury. That rule was suspect when it was announced, and I am even less confident of it today. Batson has led the Court to disregard Article III's limitations on standing by giving a windfall to a convicted criminal who, even under Batson 's logic, suffered no injury. It has forced equal protection principles onto a procedure designed to give parties absolute discretion in making individual strikes. And it has blinded the Court to the reality that racial prejudice exists and can affect the fairness of trials.
A
In Batson , this Court held that the Equal Protection Clause prohibits the State from "challeng[ing] potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case." 476 U.S. at 89, 106 S.Ct. 1712. "[I]ndividual jurors subjected to racial exclusion have the legal right to bring suit on their own behalf." Powers v. Ohio , 499 U.S. 400, 414, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). To establish standing to assert this equal protection claim in a separate lawsuit, the juror would need to *2270 show that the State's action caused him to suffer an injury in fact, and a likelihood that a favorable decision will redress the injury. Lujan v. Defenders of Wildlife , 504 U.S. 555, 560-561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Flowers, however, was not the excluded juror. And although he is a party to an ongoing proceeding, " ' "standing is not dispensed in gross" ' "; to the contrary, " 'a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought.' " Town of Chester v. Laroe Estates, Inc. , 581 U. S. ----, ----, 137 S.Ct. 1645, 1465, 198 L.Ed.2d 64 (2017).
Flowers should not have standing to assert the excluded juror's claim. He does not dispute that the jury that convicted him was impartial, see U. S. Const., Amdt. VI, and as the Court has said many times, " '[d]efendants are not entitled to a jury of any particular composition.' " Holland v. Illinois , 493 U.S. 474, 483, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990). He therefore suffered no legally cognizable injury. The only other plausible reason a defendant could suffer an injury from a Batson violation is if the Court thinks that he has a better chance of winning if more members of his race are on the jury. But that thinking relies on the very assumption that Batson rejects: that jurors might " 'be partial to the defendant because of their shared race.' " Ante, at 2241 (quoting Batson , supra, at 97, 106 S.Ct. 1712 ). Moreover, it cannot be squared with the Court's later decisions, which hold that "race is irrelevant to a defendant's standing to object to the discriminatory use of peremptory challenges." Powers , 499 U.S. at 416, 111 S.Ct. 1364 (holding that a white defendant has standing to challenge strikes of black jurors).
Today, the Court holds that Carolyn Wright was denied equal protection by being excluded from jury service. But she is not the person challenging Flowers' convictions (she would lack standing to do so), and I do not understand how Flowers can have standing to assert her claim. Why should a "denial of equal protection to other people" that does "not affect the fairness of that trial" mean that "the defendant must go free"? Id. , at 431, 111 S.Ct. 1364 (Scalia, J., dissenting).
In Powers , the Court relied on the doctrine of third-party standing. As an initial matter, I doubt "whether a party who has no personal constitutional right at stake in a case should ever be allowed to litigate the constitutional rights of others." Kowalski v. Tesmer , 543 U.S. 125, 135, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004) (THOMAS, J., concurring); see also Whole Woman's Health v. Hellerstedt , 579 U. S. ----, ---- - ----, 136 S.Ct. 2292, 2321-2324, 195 L.Ed.2d 665 (2016) (THOMAS, J., dissenting).
Even accepting the notion of third-party standing, it is hard to see how it could be satisfied in Batson cases. The Court's precedents require that a litigant asserting another's rights have suffered an " 'injury in fact' " and have "a close relation" to the third party. Powers , supra , at 411, 111 S.Ct. 1364. As shown, Flowers suffered no injury in fact under the Court's precedents. Moreover, in the ordinary case, the defendant has no relation whatsoever to the struck jurors. (Here, as it happens, all the struck jurors knew Flowers or his family, but that hardly helps his Batson claim.)
In Powers , the Court concluded that defendants and struck jurors share a "common interest." 499 U.S. at 413, 111 S.Ct. 1364. But like most defendants, Flowers' interest is in avoiding prison (or execution). A struck juror, by contrast, is unlikely to feel better about being excluded from jury service simply because a convicted criminal may go free. And some *2271 potential jurors, like Flancie Jones here, " 'really and truly ... don't want to' " serve on a jury in the first place. App. 181 (emphasis added); see also Hayes v. Missouri , 120 U.S. 68, 71, 7 S.Ct. 350, 30 L.Ed. 578 (1887) (referring to "an unfortunate disposition on the part of business men to escape from jury duty"). If Flowers had succeeded on his Batson claim at trial and forced Jones onto the jury, it seems that he -her supposed third-party representative with a "common interest"-would have inflicted an injury on her.
Our remedy for Batson violations proves the point. The convicted criminal, who suffered no injury, gets his conviction vacated.[12] And even if the struck juror suffered a cognizable injury, but see Powers , supra, at 423-426, 111 S.Ct. 1364 (Scalia, J., dissenting), that injury certainly is not redressed by undoing the valid conviction of another. Under Article III, Flowers should not have standing.
B
The more fundamental problem is Batson itself. The "entire line of cases following Batson " is "a misguided effort to remedy a general societal wrong by using the Constitution to regulate the traditionally discretionary exercise of peremptory challenges." Campbell v. Louisiana , 523 U.S. 392, 404, n. 1, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998) (THOMAS, J., concurring in part and dissenting in part). "[R]ather than helping to ensure the fairness of criminal trials," Batson "serves only to undercut that fairness by emphasizing the rights of excluded jurors at the expense of the traditional protections accorded criminal defendants of all races." Campbell, supra, at 404, n. 1, 118 S.Ct. 1419. I would return to our pre- Batson understanding-that race matters in the courtroom-and thereby return to litigants one of the most important tools to combat prejudice in their cases.
1
In Strauder v. West Virginia , 100 U.S. 303, 25 L.Ed. 664 (1880), the Court invalidated a state law that prohibited blacks from serving on juries. In doing so, we recognized that the racial composition of a jury could affect the outcome of a criminal case. See id., at 308-309. The Court explained that "[i]t is well known that prejudices often exist against particular classes in the community, which sway the judgment of jurors, and which, therefore, operate in some cases to deny to persons of those classes the full enjoyment of that protection which others enjoy." Id. , at 309. Thus, we understood that allowing the defendant an opportunity to "secur[e] representation of the defendant's race on the jury may help to overcome racial bias and provide the defendant with a better chance of having a fair trial." Georgia v. McCollum , 505 U.S. 42, 61, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992) (THOMAS, J., concurring in judgment).
In Swain v. Alabama , 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), the Court held that individual peremptory strikes could not give rise to an equal protection challenge. Swain followed Strauder in assuming that race-like other factors that are generally unsuitable for the government to use in making classifications-can be considered in peremptory strikes: "In the quest for an impartial and qualified *2272 jury, Negro and white, Protestant and Catholic, are alike subject to being challenged without cause." Swain , 380 U.S. at 221, 85 S.Ct. 824. That is because the peremptory "challenge is 'one of the most important of the rights secured to the accused.' " Id. , at 219, 85 S.Ct. 824. Based on its long history, the peremptory system "affords a suitable and necessary method of securing juries which in fact and in the opinion of the parties are fair and impartial." Id., at 212, 85 S.Ct. 824 ; see id., at 212-219, 85 S.Ct. 824. The strike both "eliminate[s] extremes of partiality on both sides" and "assure[s] the parties that the jurors before whom they try the case will decide on the basis of the evidence placed before them, and not otherwise." Id., at 219, 85 S.Ct. 824. Because this system, "in and of itself, provides justification for striking any group of otherwise qualified jurors in any given case, whether they be Negroes, Catholics, accountants or those with blue eyes," id., at 212, 85 S.Ct. 824, we concluded that an equal protection challenge was unavailable against individual peremptory strikes.
Then, in a departure from the previous century of jurisprudence, the Court moved its focus from the protections accorded the defendant to the perceptions of a hypothetical struck juror . In Batson , the Court concluded that the government could not exercise individual strikes based solely on "the assumption-or [the] intuitive judgment-that [jurors] would be partial to the defendant because of their shared race." 476 U.S. at 97, 106 S.Ct. 1712. The Court's opinion in Batson equated a law categorically excluding a class of people from jury service with the use of discretionary peremptory strikes to remove members of that class: "Just as the Equal Protection Clause forbids the States to exclude black persons from the venire on the assumption that blacks as a group are unqualified to serve as jurors, so it forbids the States to strike black veniremen on the assumption that they will be biased in a particular case simply because the defendant is black." Ibid. (citation omitted). Batson repeatedly relies on this analogy. See id., at 86, 89, 106 S.Ct. 1712 ; id., at 87, 106 S.Ct. 1712 ("A person's race simply is unrelated to his fitness as a juror" (internal quotation marks omitted)); see also ante, at 2259 (quoting Batson , supra, at 104-105, 106 S.Ct. 1712 (Marshall, J., concurring)); Powers , 499 U.S. at 410, 111 S.Ct. 1364 ("Race cannot be a proxy for determining juror bias or competence").
But this framing of the issue ignores the nature and basis of the peremptory strike and the realities of racial prejudice. A peremptory strike reflects no judgment on a juror's competence, ability, or fitness. Instead, the strike is exercised based on intuitions that a potential juror may be less sympathetic to a party's case. As Chief Justice Burger emphasized, "venire-pool exclusion bespeaks a priori across-the-board total unfitness, while peremptory-strike exclusion merely suggests potential partiality in a particular isolated case. " Batson , supra , at 122-123, 106 S.Ct. 1712 (dissenting opinion) (internal quotation marks omitted); accord, Powers , supra, at 424, 111 S.Ct. 1364 (Scalia, J., dissenting). "[T]he question a prosecutor or defense counsel must decide is not whether a juror of a particular race or nationality is in fact partial, but whether one from a different group is less likely to be." Swain , 380 U.S. at 220-221, 85 S.Ct. 824 (emphasis added). Therefore, "veniremen are not always judged solely as individuals for the purpose of exercising peremptory challenges"; instead, "they are challenged in light of the limited knowledge counsel has of them, which may include their group affiliations, in the context of the case to be tried." Id. , at 221, 85 S.Ct. 824.
*2273 Batson rejects the premise that peremptory strikes can be exercised on the basis of generalizations and demands instead "an assessment of individual qualifications." 476 U.S. at 87, 106 S.Ct. 1712. The Court's Batson jurisprudence seems to conceive of jury selection more as a project for affirming "the dignity of persons" than as a process for providing a jury that is, including in the parties' view, fairer. Powers , supra , at 402, 111 S.Ct. 1364 ; see Edmonson v. Leesville Concrete Co. , 500 U.S. 614, 631, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991) ; see also J. E. B. v. Alabama ex rel. T. B. , 511 U.S. 127, 140-142, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).
2
Batson 's focus on individual jurors' rights is wholly contrary to the rationale underlying peremptory challenges. And the application of equal protection analysis to individual strikes has produced distortions in our jurisprudence that are symptomatic of its poor fit, both as a matter of common sense and the protections traditionally accorded litigants.
The Court did not apply equal protection principles to individual peremptory strikes until more than 100 years after the Fourteenth Amendment was ratified. Once it did, it quickly extended Batson to civil actions, strikes by criminal defendants, and strikes based on sex. Edmonson , supra ; McCollum , 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 ; J. E. B. , supra . But even now, we do not apply generally applicable equal protection principles to peremptory strikes. For example, our precedents do not apply "strict scrutiny" to race-based peremptory strikes. And we apply "the same protection against sex discrimination as race discrimination" in reviewing peremptory strikes, J. E. B. , supra , at 145, 114 S.Ct. 1419, even though sex is subject to "heightened" rather than "strict" scrutiny under our precedents. Finally, we have not subjected all peremptory strikes to "rational basis" review, which normally applies absent a protected characteristic. Cleburne v. Cleburne Living Center, Inc. , 473 U.S. 432, 440-442, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) ; see generally Batson , supra, at 123-125, 106 S.Ct. 1712 (Burger, J., dissenting); J. E. B. , supra, at 161, 114 S.Ct. 1419 (Scalia, J., dissenting). Thus, the Court's own jurisprudence seems to recognize that its equal protection principles do not naturally apply to individual, discretionary strikes.
Now that we have followed Batson to its logical conclusion and applied it to race- and sex-based strikes without regard to the race or sex of the defendant, it is impossible to exercise a peremptory strike that cannot be challenged by the opposing party, thereby requiring a "neutral" explanation for the strike. But requiring an explanation is inconsistent with the very nature of peremptory strikes. Peremptory strikes are designed to protect against fears of partiality by giving effect to the parties' intuitions about jurors' often-unstated biases. "[E]xercised on grounds normally thought irrelevant to legal proceedings or official action," like "race, religion, nationality, occupation or affiliations," Swain , supra , at 220, 85 S.Ct. 824, they are a form of action that is by nature "arbitrary and capricious," 4 W. Blackstone, Commentaries on the Laws of England 346 (1769) The strike must "be exercised with full freedom, or it fails of its full purpose." Lewis v. United States , 146 U.S. 370, 378, 13 S.Ct. 136, 36 L.Ed. 1011 (1892). Because the strike may be exercised on as little as the "sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another," id., at 376, 13 S.Ct. 136, reasoned explanation is often impossible. And where scrutiny of individual strikes is permitted, the strike is "no longer *2274 ... peremptory, each and every challenge being open to examination." Swain , supra , at 222, 85 S.Ct. 824.
In sum, as other Members of this Court have recognized, Batson charted the course for eliminating peremptory strikes. See, e.g., Rice v. Collins , 546 U.S. 333, 344, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006) (BREYER, J., concurring); Batson , supra, at 107-108, 106 S.Ct. 1712 (Marshall, J., concurring). Although those Justices welcomed the prospect, I do not. The peremptory system "has always been held essential to the fairness of trial by jury." Lewis , supra, at 376, 13 S.Ct. 136. And the basic premise of Strauder -that a juror's racial prejudices can make a trial less fair-has not become "obsolete." McCollum , 505 U.S. at 61, 112 S.Ct. 2348 (opinion of THOMAS, J.). The racial composition of a jury matters because racial biases, sympathies, and prejudices still exist. This is not a matter of "assumptions," as Batson said. It is a matter of reality.[13] The Court knows these prejudices exist. Why else would it say that "a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias"? Turner v. Murray , 476 U.S. 28, 36-37, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986).[14] For that matter, why else say here that "Flowers is black" and the "prosecutor is white"? Ante, at 2235. Yet the Court continues to apply a line of cases that prevents, among other things, black defendants from striking potentially hostile white jurors. I remain "certain that black criminal defendants will rue the day that this Court ventured down this road that inexorably will lead to the elimination of peremptory strikes." McCollum , supra, at 60, 112 S.Ct. 2348 (opinion of THOMAS, J.).
Instead of focusing on the possibility that a juror will misperceive a peremptory strike as threatening his dignity, I would return the Court's focus to the fairness of trials for the defendant whose liberty is at stake and to the People who seek justice under the law.
* * *
If the Court's opinion today has a redeeming quality, it is this: The State is perfectly free to convict Curtis Flowers again. Otherwise, the opinion distorts our legal standards, ignores the record, and reflects utter disrespect for the careful analysis of the Mississippi courts. Any competent prosecutor would have exercised the same strikes as the State did in this trial. And although the Court's opinion might boost its self-esteem, it also needlessly prolongs the suffering of four victims' families. I respectfully dissent.

E.g., Tharpe v. Sellers , 583 U. S. ----, 138 S.Ct. 545, 199 L.Ed.2d 424 (2018) (per curiam ); Buck v. Davis , 580 U. S. ----, 137 S.Ct. 759, 197 L.Ed.2d 1 (2017) ; Foster v. Chatman , 578 U. S. ----, 136 S.Ct. 1737, 195 L.Ed.2d 1 (2016) ; In re Davis , 557 U.S. 952, 130 S.Ct. 1, 174 L.Ed.2d 614 (2009) ; Snyder v. Louisiana , 552 U.S. 472, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008).

The majority also complains that the State did not ask enough "follow-up questions" of Wright. Ante, at 2249. I see no reason why the State needed more information. Besides, if the State had asked more questions, the majority would complain that the State engaged in "dramatically disparate" questioning of Wright.

The majority ignores the fact that, after the initial Batson challenge, the State tendered a black juror as an alternate instead of exercising available peremptory strikes. The State also tendered the first black juror available. This is hardly a " 'consistent pattern' " of strikes against black jurors. Ante , at 2246.

Thus, the majority is simply wrong to complain that the State failed to ask Chesteen or Lester "individual follow-up questions" on this issue. Ante, at 2249.

At a minimum, Mississippi has reasonably read Batson 's " 'prophylactic framework,' " Johnson v. California , 545 U.S. 162, 174, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005) (THOMAS, J., dissenting), to mean that the party making a Batson claim forfeits arguments not made to the trial court. See Pitchford v. State , 45 So.3d 216, 227-228 (Miss. 2010) ; accord, Record 2965. Thus, whether as a matter of Batson itself or the State's implementation of Batson , Flowers forfeited these arguments.

These mistakes continued before this Court. Flowers asserts that in his first four trials, the State "struck every black panelist that [it] could," Brief for Petitioner 23; that is false. See infra , at 2250. Flowers says that the State asked potential juror Robinson "a total of five questions," Brief for Petitioner 15, n. 14, but it actually asked 10. See App. 82-83; Tr. 1147-1148. Flowers says that the State "did not question [Robinson] on [his] relationship" with Flowers' brother, Brief for Petitioner 46, n. 35; it did. See App. 82-83. Flowers refers to Bertha Tardy's "son," Brief for Petitioner 52, but Tardy's only child was a daughter. See Tr. 3268. Flowers says that "the Mississippi Supreme Court found two clear Batson violations" in the third trial, Brief for Petitioner 32; it did not. See infra , at 2266 - 2267. Flowers repeatedly refers to "the decidedly false claim that Wright's" and Burnside's "wages had been garnished," Brief for Petitioner 56, 50, 18, 22, n. 24, 51; Tr. of Oral Arg. 8, 11, 12, even though that claim is true. See supra, at 2254 - 2256. Flowers said that Wright "still work[ed]" at Wal-Mart at the time of jury selection, Tr. of Oral Arg. 16; she did not. Tr. 782. Flowers agreed that in this trial, the State struck "every black juror that was available on the panel" after "the first one," Tr. of Oral Arg. 57-58; Reply Brief 1, but it did not. See App. 241 (tendering a black juror as an alternate).

One trial had to be moved to a new venue because "during voir dire it became apparent that a fair and impartial jury could not be impaneled." Flowers v. State , 842 So.2d 531, 535 (Miss. 2003). At another trial, one of two black jurors seated was "excused after he informed the judge that he could not be a fair and impartial juror." Flowers v. State , 947 So.2d 910, 916 (Miss. 2007). And at the next trial, one of the alternate jurors, who was black, was convicted of perjury after it came to light that she had lied during voir dire about not knowing Flowers and had visited him in jail. Flowers v. State , 240 So.3d 1082, 1137 (Miss. 2017).

The majority seems to draw a distinction between individual questions asked during group voir dire and individual questions asked during individual voir dire . Ante , at 2246 - 2247. I cannot imagine why this distinction would matter here. The majority does not explain its reasoning, and its statistics treat these questions the same.

The majority ominously warns that, through questioning, prosecutors "can try to find some pretextual reason ... to justify what is in reality a racially motivated strike" and that "[p]rosecutors can decline to seek what they do not want to find about white prospective jurors." Ante, at 2248. I would not so blithely impute single-minded racism to others. Doing so cheapens actual cases of discrimination.

The Court repeatedly and inaccurately attributes statements by the plurality to the Mississippi Supreme Court-or deems those statements part of a "lead opinion," ante, at 2236, 2245, even though a majority of that court disagreed in relevant part. The Court also takes the plurality's statements out of context. For instance, three times the Court quotes the plurality's statement that " '[t]he instant case presents us with as strong a prima facie case of racial discrimination as we have ever seen in the context of a Batson challenge.' " Ante, at 2235, 2237, 2245. But that statement was focused solely on the fact that "[t]he prosecutor exercised all fifteen of his peremptory strikes on African-Americans." Flowers , 947 So.2d at 935. One could just as easily say that Flowers' own strikes here-11 whites, zero blacks-present an overwhelming prima facie case of racial discrimination. Tr. of Oral Arg. 57 (admitting that Flowers' trial counsel "only exercised peremptories against white jurors"). As the Court understands, a prima facie case is only the first step of Batson , ante, at 2240 - 2241, and a majority of the Mississippi Supreme Court in the third trial found that Flowers failed to carry his burden of proving purposeful racial discrimination as to any strike.

Rather than explain its numbers, the Court points out that when pressed at oral argument, the State agreed that 41 of 42 potential black jurors had been stricken. Ante , at 2236, 2245. No one else-not even Flowers-has agreed with that statistic. See Brief for Petitioner 32; App. 35. Flowers certainly did not present it to the state courts. The question before us is whether those courts clearly erred, and in reviewing their decisions, we must affirm " 'if the result is correct' " based on the actual record. NLRB v. Kentucky River Community Care, Inc. , 532 U.S. 706, 722, n. 3, 121 S.Ct. 1861, 149 L.Ed.2d 939 (2001).

The Court has never explained "why a violation of a third party's right to serve on a jury should be grounds for reversal when other violations of third-party rights, such as obtaining evidence against the defendant in violation of another person's Fourth or Fifth Amendment rights, are not." Campbell v. Louisiana , 523 U.S. 392, 405, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998) (THOMAS, J., concurring in part and dissenting in part).

Academic studies appear to support this commonsense proposition. See, e.g., Carter & Mazzula, Race and Racial Identity Status Attitudes, 11 J. Ethnicity Crim. Justice 196, 211 (2013) ("[R]acial bias exists in juror decision making"); Ellsworth & Sommers, Race in the Courtroom, 26 Personality & Soc. Psychol. Bull. 1367, 1367-1379 (2000). Cf. J. E. B. v. Alabama ex rel. T. B. , 511 U.S. 127, 148-149, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) (O'Connor, J., concurring) ("We know that like race, gender matters").

It is telling that Flowers here sought a new trial because the trial court supposedly failed to allow sufficient questioning on racial prejudice. See Record 2936. Evidently Flowers was operating "on the assumption that" jurors might "be biased in a particular case simply because the defendant is black." Batson v. Kentucky , 476 U.S. 79, 97, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Perhaps unsurprisingly, then, he exercised peremptory strikes against 11 white jurors and 0 black jurors.